**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

| | |
|---|---|
| CARLOS CABALLERO, on behalf of himself and all others similarly situated, | |
| Plaintiff, | Civ. A. No. 1:21-cv-_____ |
| v. | <u>COMPLAINT - CLASS ACTION</u> |
| DANIMER SCIENTIFIC, INC., STEPHEN E. CROSKREY, and JOHN A. DOWDY III, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

**TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................ 1

II.  JURISDICTION AND VENUE.................................................. 6

III.  PARTIES .................................................................. 7

IV.  BACKGROUND .......................................................... 8

V.  DANIMER DEFRAUDS INVESTORS ......................................... 11

VI.  DISCLOSURES OF DANIMER'S MISCONDUCT CAUSE
     SIGNIFICANT INVESTOR LOSSES............................................. 19

VII.  LOSS CAUSATION ....................................................... 22

VIII.  CLASS ACTION ALLEGATIONS.................................... 22

IX.  INAPPLICABILITY OF STATUTORY SAFE HARBOR ............. 24

X.  PRESUMPTION OF RELIANCE ...................................... 25

XI.  COUNT I ................................................................. 27

XII.  COUNT II .............................................................. 29

XIII.  PRAYER FOR RELIEF .................................................. 29

XIV.  JURY DEMAND......................................................... 30

Plaintiff Carlos Caballero ("Plaintiff"), by and through his counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by Danimer Scientific, Inc. ("Danimer" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Danimer; and (d) other public information regarding the Company.

## INTRODUCTION

1.     This federal securities class action is brought on behalf of all those that purchased Danimer securities during the time period from December 30, 2020 to May 3, 2021, inclusive (the "Class Period").  The claims are alleged against Danimer and certain of the Company's senior executives (collectively, "Defendants"), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     Headquartered in Bainbridge, Georgia, Danimer (formerly known as Meredian Holdings Group, Inc.) is a manufacturer of plastics known as polyhydroxyalkanoates ("PHAs") that are derived from living organisms instead of

1

fossil fuels.  Danimer's principal product is Nodax, the brand name of a purportedly biodegradable PHA.  Nodax is made by feeding canola oil to bacteria, from which carbon is extracted and turned into plastic.

3.    Danimer became a publicly traded company through the acquisition of its predecessor company (the "De-SPAC Transaction") by Live Oak Acquisition Corp. ("Live Oak"), a special purpose acquisition company ("SPAC").  Danimer began trading on the New York Stock Exchange (the "NYSE") on December 30, 2020.

4.    Throughout the Class Period, Danimer misled investors with regard to Nodax's environmental benefits, its viability as a fully biodegradable alternative to conventional plastic, the level of demand for Nodax, and the average selling price for Nodax.   Among other things, Defendants touted Nodax as "a 100% biodegradable, renewable and sustainable plastic" "that reliably breaks down in both industrial composting facilities and backyard compost units" and "will biodegrade aerobically or anaerobically in soil, water and industrial or home compost within three to six months depending on conditions."  Danimer also claimed that it was completely sold out of its current and future production of Nodax until 2024 due to a robust "current demand pipeline" and that it had plans to "double the size of our planned greenfield facility to further capture the growing demand from customers."

2

Danimer also reported that it had purchased an additional production facility in Kentucky (the "Kentucky Facility") and that "[s]everal components of the first phase of the production capacity buildout were completed at the end of the third quarter of 2020[.]"  The Company also told investors that the average selling price for Nodax was "pushing about $2.70 [per pound]" and "increasing."

5.     These statements were materially false and misleading.  In truth, Nodax does not biodegrade anaerobically, can be much worse for the environment than traditional plastic in certain respects, and biodegrades aerobically at a much slower rate than the Company claims and only under specific conditions not accessible to all consumers.  Moreover, contrary to Danimer's statements about growing customer demand requiring expansions of the Company's production facilities, Danimer's existing facilities were not operating at full capacity.  Indeed, internal Danimer documents obtained through a Freedom of Information Act ("FOIA") request show that production had been steadily declining in 2020, from about 55,000 pounds per month to about 40,000 pounds per month by mid-year and even going negative for some months.  Danimer had also underreported the purchase price for the Kentucky Facility by more than $10 million in its de-SPAC registration statement and annual report.  The Kentucky Facility's production capacity buildout was also severely behind schedule.  Finally, Danimer also overstated the average selling price for

Nodax by 30% to 40% to investors.  These figures cast doubt on Danimer's statements that it is fully sold out for the next two years due to increasing customer demand.

6.      The truth began to emerge on March 20, 2021, when *The Wall Street Journal* published an article debunking Danimer's claims that Nodax breaks down far more quickly than fossil-fuel plastics.  The article reported that according to the same expert who co-authored a study touted by Danimer as "certifying" Nodax's biodegradability, "many claims about Nodax are exaggerated and misleading." According to that expert, Danimer's broad claims about Nodax's biodegradability were "not accurate" and "greenwashing."  The article also quoted Danimer's Chief Technology Officer, Phil Van Trump, admitting that Defendant Croskrey's statements that bacteria in a landfill would consume Nodax were not "wholly accurate."  Instead, Van Trump admitted that Nodax products are "unlikely to biodegrade in most modern landfills."

7.      As a result of these disclosures, the price of Danimer stock declined by $6.43 per share, from $49.98 per share on March 19, 2021 to $43.55 per share on March 22, 2021, or approximately 13%.

8.      On April 22, 2021, research firm Spruce Point Capital Management ("Spruce Point") issued a report (the "April Report") demonstrating that the

Company's annual report disclosures regarding the purchase price of the Kentucky Facility were inconsistent with city records.  The April Report also established that the production capacity buildout of the Kentucky Facility was only 10% completed as of January 15, 2021, throwing into question Danimer's earlier statements that several components of the first phase of the production capacity buildout were completed at the end of the third quarter of 2020.

9.     Spruce Point's April Report also contained findings from a recent research study into the biodegradability of PHAs that in an anaerobic environment, such as a sealed landfill, the PHA product does not completely biodegrade. According to Spruce Point, the study states that bioplastics in a landfill can, in fact, be worse than traditional plastic, as they release methane gas, which has a global warming potential that is multiples higher than that of carbon dioxide.  The April Report also revealed that Danimer has a history of overstating the size and capacity of its manufacturing facilities, with its descriptions of its production rates consistently changing over the years.

10.     These disclosures caused the price of Danimer stock to decline by $2.01 per share, from $25.00 per share on April 21, 2021 to $22.99 per share on April 22, 2021, or approximately 8%.

11.     Then, on May 4, 2021, Spruce Point issued a follow-up report (the "May Report") containing information about Danimer newly obtained through a FOIA request on the Kentucky Department of Environmental Protection ("Kentucky DEP").  The May Report revealed that Danimer's production figures, average selling price, and financial projections had been "wildly overstated."

12.     As a result of these disclosures, the price of Danimer stock declined by $1.49 per share, from $23.63 per share on May 3, 2021 to $22.14 per share on May 4, 2021, or approximately 6%.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Venue is proper in this District and Division pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1391(b), and Local Rule 3.4.  Danimer maintains its corporate headquarters in Bainbridge, Georgia, which is situated in this District, and the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and

misleading information, occurred in this District, in the Albany Division.   In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

15.   Plaintiff Carlos Caballero is a resident of New Jersey.  As set forth in the attached Certification, Plaintiff purchased shares of Danimer stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

16.   Defendant Danimer is a biopolymer manufacturer.  The Company's signature product is the bioplastic Nodax.  Incorporated in Delaware, the Company maintains its corporate headquarters at 140 Industrial Boulevard, Bainbridge, Georgia.  Danimer stock trades on the NYSE, which is an efficient market, under ticker symbol "DNMR."  As of March 26, 2021, Danimer had over 88 million shares of stock outstanding, owned by hundreds or thousands of investors.

17.   Defendant Stephen E. Croskrey ("Croskrey") is, and was at all relevant times, Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Danimer.

18.     Defendant John A. Dowdy III ("Dowdy") is, and was at all relevant times, Chief Financial Officer ("CFO") of Danimer.

19.     Defendants Croskrey and Dowdy are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with Danimer, possessed the power and authority to control the contents of Danimer's SEC reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.   Each of the Individual Defendants was provided with copies of the Company's reports, press releases, and other information alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading.

## **BACKGROUND**

20.     Danimer presents itself as a biopolymer manufacturing company whose signature product is Nodax.  Nodax is the brand name of a resin belonging to a family of plastics known as PHAs, which each exhibit biodegradable and biobased

qualities.  Danimer produces Nodax by feeding canola oil to bacteria, from which carbon is extracted and turned into plastic.  Danimer uses Nodax for a wide range of applications, including custom-formed or "thermoformed" trays, drinking straws, flexible and multi-layer film packaging, coatings, disposable cutlery, and more.

21.    On August 7, 2018, Meredian Holdings Group, Inc., a privately-held company doing business as Danimer Scientific ("Legacy Danimer"), issued a press release announcing that the University of Georgia ("UGA") and the UGA New Materials Institute had recognized Nodax "as an eco-friendly alternative to petrochemical plastics."[1]    Following that announcement, Legacy Danimer repeatedly claimed that Nodax was verified as a "truly biodegradable alternative to petrochemical plastics" by the 2018 study.[2]

22.    Biodegradable plastics have become an area of focus for investors as public opinion has grown increasingly aware and critical of single-use plastic,

[1] Press Release, Danimer Scientific, Inc., Study: Danimer PHA Verified as Reliable Biodegradable Alternative to Traditional Plastic Packaging (Aug. 7, 2018), https://www.prnewswire.com/news-releases/study-danimer-pha-verified-as-reliable-biodegradable-alternative-to-traditional-plastic-packaging-300692770.html.

[2] *See, e.g.*, Press Release, Bacardi Limited, Bacardi First in Fight Against Plastic Pollution With 100% Biodegradable Spirits Bottle (Oct. 21, 2020), https://www.businesswire.com/news/home/20201021005281/en/Bacardi-First-in-Fight-Against-Plastic-Pollution-With-100-Biodegradable-Spirits-Bottle.

especially the plastic waste that ends up in the ocean. Various national and local governments have imposed bans on products made from single-use plastics in recent years, including a number of states in the United States.

23.    Live Oak was incorporated in the State of Delaware in May 2019 as a SPAC formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, recapitalization, reorganization or similar business combination with one or more businesses.  Live Oak completed its initial public offering in May 2020 and began trading on the NYSE under the ticker symbol "LOAK."

24.    On October 5, 2020, Legacy Danimer and Live Oak announced a definitive agreement for a business combination by which Live Oak would acquire Legacy Danimer and would result in Legacy Danimer's becoming a public company (the "De-SPAC Transaction").  Upon the closing of the De-SPAC Transaction, the combined company would be renamed Danimer Scientific, Inc. and its common stock would trade under the ticker symbol "DNMR" on the NYSE beginning December 30, 2020.

25.    On December 28, 2020, Live Oak's board of directors unanimously approved the De-SPAC Transaction.  Live Oak's stockholders, likewise, approved the De-SPAC Transaction at a special meeting.

26.     On December 29, 2020, Legacy Danimer and Live Oak announced that they had completed the De-SPAC Transaction.   Legacy Danimer's senior management team would continue to lead the new combined company.   In addition to continuing as CEO, Defendant Croskrey was named Chairman of Danimer's board.

## DANIMER DEFRAUDS INVESTORS

27.     On December 29, 2020, Danimer issued a press release, which it also filed with the SEC on Form 8-K, announcing the consummation of the De-SPAC Transaction.   In the press release, the Company stated, "[Danimer] is a pioneer in creating environmentally responsible and natural alternative solutions to traditional petroleum-based resins.     The signature polymer, Nodax PHA (polyhydroxyalkanoate), is a 100% biodegradable, renewable and sustainable plastic produced using canola oil as a primary feedstock."

28.     The Class Period begins on December 30, 2020, the day Danimer common stock began trading on the NYSE.

29.     On January 5, 2021, Danimer filed with the SEC on Form 8-K a report of the De-SPAC Transaction's completion.

30.     Following a marked rise in Danimer's stock price, on January 28, 2021, Danimer filed a Registration Statement with the SEC on Form S-1 for the issuance

11

of up to 32,435,961 shares of common stock and up to 16,279,253 shares of Class A common stock issuable upon the exercise of warrants and options previously issued by Legacy Danimer and Live Oak (the "January 28, 2021 Registration Statement"). The January 28, 2021 Registration Statement stated, "In December 2018, Danimer consummated the acquisition of the Kentucky Facility, including the equipment, machinery and other personal property located at such facility for a purchase price of $23 million[.]"  The January 28, 2021 Registration Statement also stated that Danimer had a two-phase commissioning strategy for the Kentucky Facility, and that "[s]everal components of the first phase of the production capacity buildout were completed at the end of the third quarter of 2020[.]"

31.    The January 28, 2021 Registration Statement also discussed Nodax, stating, "Our PHA . . . will biodegrade aerobically or anaerobically in soil, water and industrial or home compost within three to six months depending on conditions."  It also stated, "[O]ur bio-plastic products are intended to address many of the concerns regarding traditional petroleum-based plastics[.]"  The Individual Defendants signed the Registration Statement.

32.    The statements and omissions set forth in ¶¶30-31 were materially false and misleading.  In truth, Nodax does not biodegrade anaerobically, can be much worse for the environment than traditional plastic in certain respects, and

biodegrades aerobically at a much slower rate than the Company claims and only under specific conditions not accessible to all consumers.  Moreover, Danimer had paid several million dollars more to purchase the Kentucky Facility than it reported in its annual report and registration statements, and the production capacity buildout was only 10% complete.

33.    On March 16, 2021, Danimer issued a joint press release with global snack maker Mars Wrigley, announcing a two-year partnership to use Nodax for home-compostable packaging for Mars Wrigley's global portfolio of treats.  The press release touted the certified, reliable biodegradability of Nodax in soil and marine environments, as well as in industrial and home composting.  Specifically, the press release asserted that Nodax "biodegrades in both soil and marine environments."  In the press release, Danimer also announced its "plan to introduce Nodax®PHA into flexible and rigid packaging that reliably breaks down in both industrial composting facilities and backyard compost units, offering an enhanced value proposition for environmentally conscious consumers and retailers."  The press release further states that "Nodax®PHA can serve as an alternative to traditional petrochemical plastic and has been certified as biodegradable in soil and marine environments."

34.     The statements and omissions set forth in ¶33 were materially false and misleading.  In truth, Nodax does not biodegrade anaerobically, can be much worse for the environment than traditional plastic in certain respects, and biodegrades aerobically at a much slower rate than the Company claims and only under specific conditions not accessible to all consumers.

35.     The truth about Nodax began to emerge on March 20, 2021, when *The Wall Street Journal* published an article disputing Danimer's claims that Nodax breaks down far more quickly than fossil fuel-based plastics.  The article reported that, according to several experts on biodegradable plastics, "many claims about Nodax are exaggerated and misleading."  In the article, Dr. Jason Locklin, the expert who had co-authored the UGA study touted by Danimer as "certifying" Nodax's biodegradability, stated that Danimer's statements "sensationalized" the truth regarding Nodax's properties.  According to Dr. Locklin, Danimer's broad claims about Nodax's biodegradability were "not accurate" and "greenwashing."  In reality, Dr. Locklin's study showed that while Nodax in powdered form breaks down quickly, the biodegradation rate is much more variable when tested as a film—the form used to make bags, straws, and bottles.

36.     The article also quoted Danimer's Chief Technology Officer, Phil Van Trump, disputing Dr. Locklin's statements and saying, "The material truly is

14

biodegradable so we're not greenwashing." But in response to questions from *The Wall Street Journal*, Van Trump admitted that Defendant Croskrey's October 2020 claim that Nodax would be consumed by bacteria if in a landfill "wasn't wholly accurate." Instead, as Van Trump conceded, Nodax products are "unlikely to biodegrade in most modern landfills."

37.     According to Dr. Ramani Narayan, a professor at Michigan State University who has been researching biodegradable plastics for over 30 years, variations in temperature and microorganisms in the ocean make it very difficult to promise, for instance, that a bottle made from Nodax will biodegrade in a certain number of months. Dr. Narayan told *The Wall Street Journal* that at some ocean temperatures, Nodax straws could take between five and ten years to biodegrade, while bags and bottles could take even longer.

38.     As a result of these disclosures, the price of Danimer stock declined by $6.43 per share, from $49.98 per share on March 19, 2021 to $43.55 per share on March 22, 2021, or approximately 13%.

39.     Despite these disclosures, Danimer continued to misrepresent the biodegradability of and demand for Nodax, the product's purchase price, and the production capacities of Danimer's facilities.

40.     On March 29, 2021, Danimer issued a press release announcing its fourth quarter and year-end 2020 financial results, which it also filed with the SEC on Form 8-K (the "2020 8-K").  In the 2020 8-K, Defendant Croskrey touted the Company's "commercial-scale bioplastic technology" as "unrivaled."  The 2020 8-K also stated, "Market demand remains robust for Danimer's signature polymer, Nodax™ PHA (polyhydroxyalkanoate), a 100% biodegradable, renewable, and sustainable plastic produced using canola oil as a primary feedstock."  The Company also stated, "Danimer has experienced intense demand and accelerating growth for its marine degradable PHA products, the highest standard of biodegradability, which offer a better beginning-of-life and end-of-life cycle solution than any of today's traditional plastics."

41.     The 2020 8-K also announced Danimer's plans to "double the anticipated capacity" of its new, "state-of-the-art" greenfield facility in Bainbridge, Georgia (the "Greenfield Facility") "from 125 million to 250 million finished pounds of PHA products annually."  The Greenfield Facility would come online in two phases, with an initial three fermenters expected in mid-2023 and a second set of three fermenters anticipated in early 2024.  The Company stated, "Based on the current demand pipeline, the Company continues to forecast that capacity at the Greenfield plant will be sold out."

42.     Also on March 29, Danimer held an earnings conference call to discuss its fourth quarter and year-end 2020 results.  On the call, Defendant Croskrey again touted "the depth and capabilities of our high growth next-generation eco tech company that produces 100% biodegradable polymers for use in plastic applications."  Defendant Croskrey also told investors that the Company "plans to add 315 million pounds of nameplate production capacity by 2024" and that it would "double the size of our planned Greenfield Facility to further capture the growing demand from customers."  On the call, an analyst asked about Nodax's average per-pound price.  Defendant Croskrey replied that the average selling price was "pushing about $2.70 [per pound]" and "it's been increasing slightly, over the last few months."  Defendant Croskrey also reiterated to investors on the call that Danimer was fully sold out through 2024 due to high customer demand, describing plans to double the size of the Company's planned Greenfield Facility by 2024 to "catch up with demand."  He added, "Even with the planned doubling of the facility, we continue to forecast that the Greenfield plant will be sold out."

43.     On March 30, 2021, Danimer filed its annual report for 2020 with the SEC on Form 10-K (the "2020 10-K").  The 2020 10-K contained a description of Nodax that included the statement: "Our PHA . . . will biodegrade aerobically or anaerobically in soil, water and industrial or home compost within three to six

months depending on conditions."  The 2020 10-K also contained a discussion of the Kentucky Facility, and again stated, "In December 2018, we consummated the acquisition of the Kentucky Facility, including the equipment, machinery and other personal property located at such facility for a purchase price of $23 million. . . . We had completed several components of the first phase of the production capacity buildout by the end of the third quarter of 2020."

44.    The 2020 10-K contained certifications from Defendants Croskrey and Dowdy pursuant to the Sarbanes-Oxley Act of 2002 attesting to the accuracy of the 2020 10-K.

45.    The statements and omissions set forth in ¶¶40-44 were materially false and misleading.  In truth, Nodax does not biodegrade anaerobically, can be much worse for the environment than traditional plastic in certain respects, and biodegrades aerobically at a much slower rate than the Company claims and only under specific conditions not accessible to all consumers.  Moreover, Danimer had paid several million dollars more to purchase the Kentucky Facility than it had reported in its annual report and registration statements, and the production capacity buildout was only 10% complete.  Additionally, Danimer's monthly production at the Greenfield Facility had steadily declined throughout 2020 and was severely below capacity, contradicting Danimer's representations that it is fully sold out for

18

the next two years due to increasing customer demand. Similarly, Danimer's statement that the average selling price for Nodax fell in the range of $2.50 to $2.70 per pound was overstated by 30% to 40%. In reality, the average selling price was closer to $1.74 per pound.

## DISCLOSURES OF DANIMER'S MISCONDUCT CAUSE SIGNIFICANT INVESTOR LOSSES

46.    On April 22, 2021, research firm Spruce Point issued a report further revealing the truth about Danimer. The April Report demonstrated that the Company's disclosures in its Registration Statement and 2020 10-K regarding the purchase price of the Kentucky Facility were inaccurate. The Company had reported the purchase price at $23 million, but records from the City of Winchester, where the facility is located, showed the price was $36 million. The April Report also showed that the buildout of the Kentucky Facility's production capacity was only 10% completed as of January 15, 2021, contradicting the Company's statements that it had completed several components of the first phase of the production capacity buildout by the end of the third quarter of 2020. The April Report also contained findings from a research study into the biodegradability of PHA that in an anaerobic environment, such as a sealed landfill, the PHA product does not completely biodegrade. According to Spruce Point, the paper states that bioplastics in a landfill can, in fact, be worse than traditional plastic, as they release methane gas, which has

a global warming potential that far exceeds that of carbon dioxide.  These findings contradicted Defendants' claims and confirm the concerns raised by *The Wall Street Journal*.

47.    The April Report also revealed that Danimer has a history of overstating the size and capacity of its manufacturing facilities, with its descriptions of its production rates consistently changing over the years.

48.    These disclosures caused the price of Danimer stock to decline by $2.01 per share, from $25.00 per share on April 21, 2021 to $22.99 per share on April 22, 2021, or approximately 8%.

49.    Then, on May 4, 2021, Spruce Point issued a follow-up report containing information about Danimer that had been newly obtained through a FOIA request on the Kentucky DEP.  In the May Report, Spruce Point revealed that Danimer's production figures, average selling price, and financial projections are "wildly overstated."  Specifically, the May Report showed that in its reports to the Kentucky DEP, Danimer materially misreported its monthly PHA production for the Kentucky Facility by as much as 100% in some months by including the production from the Greenfield Facility.  Danimer restated those monthly production reports on January 29, 2021—conveniently, only *after* Danimer's public listing on the NYSE.

Even though this overstatement and restatement had occurred, the 2020 10-K did not disclose any weakness in the Company's internal controls.

50.     The May Report also showed that, based on Danimer's actual production and sales figures as certified to the Kentucky DEP, Danimer's average selling price for Nodax was overstated by 30% to 40%.  In addition, according to the May Report, Danimer has been producing Nodax at levels significantly below full production capacity.  Specifically, in 2020, the Greenfield Facility was producing at ***99% below production capacity***—producing around 15,000 tons per year of PHA compared to a full capacity of more than 300,000 tons per year.  Monthly production at the Greenfield Facility declined steadily over the first half of 2020, even turning negative for two months.  Similarly, the Kentucky Facility was producing at 34% below production capacity—producing at most 345,000 pounds per month compared to a full capacity of 500,000 pounds per month.  These figures contradict Danimer's statements that its production was fully sold out for the next two years and that the reason was increasing customer demand.

51.     As a result of these disclosures, the price of Danimer stock declined by $1.49 per share, from $23.63 per share on May 3, 2021 to $22.14 per share on May 4, 2021, or approximately 6%.

## LOSS CAUSATION

52.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Danimer stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market on March 20, 2021, April 22, 2021, and May 4, 2021, the price of Danimer stock fell, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Danimer stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

53.     Plaintiff brings this action as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Danimer securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, directors, officers, and affiliates.

54.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of March 26, 2021, Danimer

had over 88 million shares of stock outstanding, owned by hundreds or thousands of investors.

55.　　There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)　　Whether Defendants violated the Exchange Act;

(b)　　Whether Defendants omitted and/or misrepresented material facts;

(c)　　Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)　　Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(e)　　Whether the price of Danimer stock was artificially inflated;

(f)　　Whether Defendants' conduct caused the members of the Class to sustain damages; and

(g)　　The extent of damage sustained by Class members and the appropriate measure of damages.

56.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

57.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

59.     Danimer's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

60.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Danimer who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic

performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

61.     At all relevant times, the market for Danimer stock was an efficient market for the following reasons, among others:

(a)     Danimer stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Danimer filed periodic public reports with the SEC and the NYSE;

(c)     Danimer regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Danimer was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

62.     As a result of the foregoing, the market for Danimer stock promptly digested current information regarding Danimer from all publicly available sources and reflected such information in the price of Danimer stock.   Under these circumstances, all purchasers of Danimer stock during the Class Period suffered similar injury through their purchase of Danimer stock at artificially inflated prices and the presumption of reliance applies.

63.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.   Because this action involves Defendants' misrepresentations of and failure to disclose material adverse information regarding the true nature of and demand for Danimer's signature product, Nodax—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the misstatements made or facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of Danimer's biodegradable plastic product, as set forth above, that requirement is satisfied here.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase Danimer stock at artificially inflated prices.

66.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in an effort to maintain artificially high market prices for Danimer stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged

and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

68.   During the Class Period, Defendants made the statements specified above, which Defendants knew, or recklessly disregarded the likelihood that the statements were false or misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

69.   Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.  Defendants engaged in this misconduct to conceal Danimer's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

70.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Danimer stock. Plaintiff and the Class would not have purchased the Company's stock at the prices they paid, or at all, had they been aware that the market prices for Danimer stock had been artificially inflated by Defendants' fraudulent course of conduct.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

72.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

73.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

74.     The Individual Defendants acted as controlling persons of Danimer within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Danimer, the Individual Defendants had the power and ability to control the actions of Danimer and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

29

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: May 18, 2021

/s/ H. Lamar Mixson
H. Lamar Mixson
Georgia Bar No. 514012
Amanda Kay Seals
Georgia Bar No. 502720
Jennifer L. Peterson
Georgia Bar No. 601355
**BONDURANT MIXSON &
ELMORE, LLP**
1201 West Peachtree Street NW
Suite 3900
Atlanta, GA 30309
Tel: (404) 881-4100
Fax: (404) 881-4111
mixson@bmelaw.com
seals@bmelaw.com
peterson@bmelaw.com
*Liaison Counsel for Plaintiff*

Avi Josefson (*pro hac vice*
forthcoming)
Scott Foglietta (*pro hac vice*
forthcoming)
Rebecca Kim (*pro hac vice*
forthcoming)
**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 554-1400
Fax: (212) 554-1444
avi@blbglaw.com
scott.foglietta@blbglaw.com
rebecca.kim@blbglaw.com
*Counsel for Plaintiff*

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this day filed the foregoing COMPLAINT with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to all counsel of record.

This the 18th day of May, 2021.

/s/ *H. Lamar Mixson*
H. Lamar Mixson
Georgia Bar No. 514012

Certificate of Service Page